Counsel for the appellant. I guess there are two appellants. Would you, before your time starts to be computed, let us know how you and your co-counsel propose to share time? We've divided it exactly in half. Mr. Kimmerer will have ten minutes and I will have ten minutes. And I'd like to reserve two minutes for rebuttal. And I don't – I've watched the questioning, too, so I don't want to violate his constitutional rights in going to his time. Well, I've found, after many years on this side of the bench, that the plans of counsel don't always materialize. So we'll do the best we can. I understand it's two minutes for you. How about co-counsel? I believe Mr. Kimmerer also wants to – All right. Well, then, between the two of you, you have 16 minutes, and then I'll let you know when you have 16 minutes, and then from then on, you're using your co-counsel's rebuttal time. All right? Does that make sense? Yes, Your Honor. So watch the clock. You might want to think of trying to bring your argument to a close at the end of eight minutes. Very well. You may proceed. Start the clock. May it please the Court. The issue of recross, this Court addressed it in the Jones case. A blanket prohibition of recross is a violation of the Sixth Amendment. In the Jones case, they went on to suggest that we read the Third Circuit case, the Riggi case, to define what's a new area. So it would be harmless error if it's not a new area. And there's a very difficult – the courts have never said exactly what a new area or a new material is. New matter. Yes, Your Honor. Well, the words used twice in the Riggi case and also, I believe, in the Codell case was new material. Right. And by new material in the Codell case, which is the Fourth Circuit case, which preceded these two cases, the material wasn't new. It was the same material. It was Dr. Levy's thesis, but the government went into it in much greater detail, a second thesis on recross, and the Court said, we've already gone into this. Now, counsel, what was new that wasn't already the subject of cross-examination earlier? The exhibits 51 and 52, which were new. There were new exhibits, but was there any material within those exhibits that wouldn't have been subject to cross-examination? There was no way without them being in the record. They purported to be statements from a Swiss cohort telling Mr. Rush, for the purpose of Mr. Quill and care, where the money went. Well, they didn't mention the defendants in the case, did they? No, sir. Mr. Mrs. Precisely, which is all of them. Let me follow through on this. As I understand it, on cross-examination, Mr. Rush was vigorously cross-examined about, you really didn't engage in these transactions at the behest of my clients, et cetera, et cetera. And on redirect, they introduced two exhibits that showed that he'd communicated with some people other than your clients about the transactions that were the subject matter of the case, right? Yes, and what he did was he said there were faxed materials, and Mr. Kimmer had boxed him into that. Where are these faxed materials? Well, but isn't that a subject already covered on cross? In other words, have you you didn't have any of these communications, did you? And he says, well, yes, I did. I have these two e-mails that demonstrate those communications. Is that a new subject? It's similar to Caudel and similar to Riggi, where they both had talked about it in direct, but they were both new materials, because we could not have cross-examined him on that. First of all, we don't believe the documents existed. We think Rush created them whole cloth, perhaps after his original meetings with the government. He had to sell the government on the conviction of these people. They don't they didn't even know any taxes when it when it came down to it. So he had to sell his clients out in order to get immunity for. I want to understand your position. Is it your position that you were prevented from cross-examining him about the authenticity of the documents? The authenticity, because there's no fax numbers on him. If you look at him, he's testified, these are the fax documents. We didn't get to cross-examine him. Well, how come there's no fax sheet? If these are so important, why didn't you create a fax receipt log? Because I'll tell you my difficulty here. The subject matter doesn't seem to be new. His credibility was attacked on these various kinds of transactions. And these are not very probative of anything. To me, they just seem to show that he communicated with somebody communicated with him, as opposed to him communicating with the defendants. But your point is that is that you think the documents were phony. Not not just that. There's enough documents in this trial that we could go to the bench and go all the way to the roof, but these are the only two documents which purport to stand up that Mr. Quill and Mr. Kerr had direct knowledge of what happened to the money after it got to Switzerland. The whole issue of the government. That's what I'm having trouble with. I've read the documents. How do they show that your clients had any knowledge at all? They're communications with other people, aren't they? It's a hearsay interpretation of Mr. Gabrie. It's an interpretation. There's nothing in it that even mentions your clients, is it? Mr. Gabrie supposedly told Mr. Rush, and Mr. Rush's hearsay interpretation of that, absolutely. I objected on hearsay also to the documents. We weren't allowed to have recross, but I objected on hearsay. You take away these two documents, we're acquitted on the tax counts, and probably Mr. Kerr's client would have been acquitted on the FBAR counts. These are the only documents that show absolute control. As the documents were attempted to be admitted, did you object? Yes, absolutely. Your objections? My objection was hearsay. I believe Mr. Kemmerer objected on predicate and beyond the scope. I read those objections. Was there anything about authenticity? I believe Mr. Kemmerer's predicate might cover that, but it's not directly. I didn't see anything about authenticity, so I was a little worried about how one, I mean, the documents now you're suggesting were fake or they weren't there, but even getting them into the record in the first place, I didn't really see any objection about that. I don't believe there's the specific objection, the word authenticity used, but I will say this, 95% or more of the documents, authenticity was stipulated to by us. Well, but you didn't know about these. We didn't do it on them. Yes, Your Honor, that's true. And so therefore, it seems to me that would have been the very best thing for you to have done. And then the second thing is, I mean, as long as I've had your answer on that, the thing that most worries me about this is that I don't ever see any challenge of this ban. I'm not sure it was a ban in the first place, because I think district judges say things off the cuff that they don't necessarily mean, and I'm not sure it was a ban, and then I didn't see any challenge of the ban. And so I'm having a tough time understanding why I am in the middle of this, why this isn't just an abuse of discretion, determination on limiting examination. I believe that the... I mean, this is a different witness, even. Well... This isn't even the same witness in which the judge says what he has to say. And here I am. I mean, I was in your spot many, many, many years. It's never been a time even when the judge said something in the pretrial where he said this is the way it's going to be, which I didn't challenge at the appropriate time based on new matter that nobody had ever seen that you're now suggesting. Nobody even said anything about that. They just went on their way, leaving the poor district judge without any opportunity to say anything one way or the other. In the cited cases, they did not finally object. You want to say Jones, and I can't remember the Third Circuit case, because I don't care really what the Third Circuit said. But, I mean, in the Jones case, I know what the Jones case says, but I see this record and I see what happened in this particular situation, and I'm having a tough time when it's new matter, unauthenticated, undetermined, that one doesn't even have the job to say, and therefore make a de novo review.  Judge Smith, may I please respond? I'll take 30 seconds out of my following, out of my rebuttal. We're standing there, and we believe that we're winning the areas where we've contested against Russia's credibility. The judge has said in the most stronger terms than in any of these other published cases, he has said, well, counsel, to me, that's recross. There's no such thing as recross. The jurors' eyes roll up like I'm an idiot, and I realize, and he's a very good judge, and he has a very good rapport with the jurors. And it was my determination and Mr. Kimmerer's determination that if we raise something that he has said doesn't happen, just like unicorns don't happen, told the jury that and instructed the jury that, that we will lose the count that we won, that we're not here trying to contest. Can I ask a question that will just require a yes or no answer, I think, and I won't use a lot of your time? Did you – did anybody request voir dire the witness at the time? Yeah. No, Your Honor. Thank you, counsel. Members of the Court, my name is Michael Kimmerer, and I work for the State. Would you please introduce yourself for the record, please, counsel? Yes, pardon? Introduce yourself for the record. Yes, I'm prepared to do that, Your Honor. My name is Michael Kimmerer, and I'm here with Rhonda Neff, my associate, and we represent the defendant, Stephen Kerr. And I'm going to address the issue, which really is the 404B issue, about all of the introduction into the record of the stock transactions and the background of these particular defendants in terms of what they did that led to these charges. So you don't want to talk about recross anymore. You're going to say recross. I wasn't going to go to recross, but we were – I will certainly confirm that it was very, very clear to us there was no recross in the courtroom. Was there an objection to the so-called 404B evidence? Yeah. As far as – and your answer is no, not a specific objection. We review for plain error? I would think you would review for plain error to a large extent, even though there's probably abuse of discretion. If you look at what transpired in the case, we went through a series of things. When we came into the case, we got all the discovery in the case, and it was clear from the discovery that two-thirds of it really related to all of these securities transactions and how the stock was acquired. It was clear from the discovery that they had investigated all that and could not find any evidence of any type of wrongdoing. We went ahead and filed a motion in limine to keep all of that evidence out because we did not feel it was really relevant. Didn't the judge say something like, I'm not going to grant it right now, we'll look at it later? That's exactly right. He did say he would look at it later. We went into that in detail, and then the trial started and is – it kept coming into the evidence, and I would say here we probably should have objected more, be real honest, at that point in time. But it kept coming in in little pieces, and you watched it build, and they kept making more and more inferences that this was all fraudulent activity, which it was not. And it got to the point after about two weeks of trial that it had been so severe, I made a motion for a mistrial at that point on the basis that we had been so prejudiced so badly, because this is a trial basically about your tax, taxes or tax, not finding the right type of return or not checking the box on your return. And we're talking about stock transactions and things that had gone on for years in many cases before even the stock was even acquired by our clients. Does it make any difference in this case that your clients were not convicted on the conspiracy count? It seems to me that in retrospect, the jury had the ability to sort out what was proved and not proved in this case. Does that make any difference in your 404B argument? I don't believe it does. And the reason why is because if you look at what the evidence was on the conspiracy count, I think they really focused on Rush, who was the only really chief witness for the government, who basically the whole case was Chris Rush. I think that when they heard his testimony, he got impeached pretty badly, that I think they put that into the conspiracy and knocked that out. That's the reason they came back with not guilty on conspiracy. But I think when they heard all of this other stuff about the stock transfers and how the stock was acquired and all of this stuff, which is normal practice and basically when you're dealing in the penny stock world, that what happened at that point in time was that they looked at the counts on the, you know, the tax counts and then found him guilty on those. I think it blurred things so badly that it was just to the point where they felt they had to find him guilty of something. Wasn't the only issue on the tax counts knowledge? Yes. In other words, it was undisputed that the returns hadn't been filed. That was it. It had to be that knowledge. That's exactly what it had been. I know you wanted to talk about the 404B, but I want to ask somebody a question about the attorney-client privilege. That was my second argument. In this case, thank you. I'm glad you're the right guy to ask. As I read this record, and again, it's a long record and I want you to correct me if I'm wrong, the government files essentially what's a motion in limine, a pretrial motion that says we want to introduce Russia's testimony under the crime fraud exception, and the response by the defense is, well, there was no crime because we were following attorney-client advice. Yes. Why doesn't that waive the attorney-client privilege? Well, that's exactly what the Court ruled on, and I'm the one that's responsible for that. When we got into the case and they raised the crime fraud exhibit, there's a whole bunch of litigation that went on before we got into the case. This was pre-indictment. What had happened is that a whole bunch of documents, attorney-client privilege documents, had been subpoenaed by the government to Rush, the attorney, and he turned them over to the government without any approval for that. Right. And I know there was a privilege examination and shielding off. And I won't go into that, so let me jump right to the point. So when we got into the case, one of the things they immediately raised, the crime fraud exception, and they admitted some documents which suggested that there was some type of fraudulent activity between Rush and the defendants in the case. I countered with a response, and in that response, I attached documents which were privileged, and I said in there that we're probably going to be in a situation where we are going to have to raise reliance on counsel. But you didn't, as I read the papers, and only one side responded on this, it was your side, didn't say, I've got a conditional defense here, Judge. I don't think this falls under the crime fraud exception, but if you're going to let it in, then I'm going to assert an advice-of-counsel defense. And even if the judge says, well, if you're asserting an advice-of-counsel defense, there's a waiver, nobody ever says to him, wait a minute, Judge, you've got this wrong. You know, that's our fallback. We're not going to do this first. So I'm having difficulty looking at this and figuring out where Judge Teelborg went wrong in concluding that you were asserting your crime on an advice-of-counsel defense, and therefore, it waived the privilege. I see that. But at the time we were doing that, because we had to respond, that was very early in the proceedings and we were responding to it, that we thought most likely would be reliance on counsel as a defense. I thought that. But there was still another potential defense. We could have taken it straight on to just show that they couldn't meet their burden. In all likelihood, I have to admit, it would have been probably reliance on counsel. We really didn't know at that time if Rush was going to be cooperating, not cooperating. We were still in kind of a fallback. And I don't think it was a bad strategic decision. I think in retrospect, it was the right one, but doesn't it waive the privilege? You know, looking back, I wish I'd filed under seal. I think I'd have a better argument if I was here. But I went ahead and filed it. The government, in their reply, immediately picked up on, well, Mr. Kimber now has waived the privilege, and because he's relying on counsel as a defense. And technically, that's absolutely right. You would waive the privilege. And when the judge saw that in his reply, he basically didn't even rule on whether there was a crime fraud exception or not. He ruled immediately that we had waived it. Roberts. And your side is down to 4 minutes at this point. You have less than 4 minutes left on your side. Less than 4 minutes. Thank you, Your Honor. For your entire side, including rebuttals. I understood that. So from that standpoint, we. I appreciate your response, Mr. Kennedy. And that's where we were at that point. What was construed to be, it was a blanket waiver. And then we get into the blanket waiver, which basically impacted us throughout the entire trial. And that was the finding of the judge. And that's how we think that was aired, just to make a blanket waiver. And we've cited the authorities why that's our position. But as I understand it from reading the record and even your argument here, you never did really fight that in front of the judge. If I look back at the record, I think I would, you know. I mean, my worry is that what the judge did, as my colleague pointed out, which is how I read the record, that there was something that you wanted to fight. You did kind of fight it by saying, well, here, I got some documents. And then you came to the point, well, I'm relying on the fact that I talked to him. So the judge says it's out. But after that, I didn't find anything where you said, judge, you're wrong. That shouldn't be your, that shouldn't be your ruling. You mean about being on the waiver. Right, right. There should not be a total waiver. I think we did raise it a couple of times. There were two objections, I believe, during the course of the trial relating to one witness, and it came up. And I think the next. But that was beyond the scope of the waiver. That was beyond the scope of the waiver. But then, you know, right before we got into argument or closing argument to the – I'm getting back to my first argument, all the fraudulent, we argued not to use the word fraud and all of that, and all of that came up. But that goes to my first argument, so I don't mean to jump around. Well, we're not – I mean, you're taking up your time. I know that, and I'm sorry. Well, be sorry for him, not for you. Okay. Well, I will then sit down here. Thank you. Very well. You have two minutes for your entire side for rebuttal, just so you're aware of that. We'll hear from the government. Good morning. May it please the Court. My name is Alex Robbins, appearing on behalf of the United States. The two defendants in this case, Mr. Kerr and Mr. Quill, were properly convicted by the district court, and this Court should affirm the judgments below so that they can begin to serve their 10-month sentences. Can I ask you to start by addressing Mr. Kimmerer's first point? When I read this long, long record, which is supposed to be a case of trial about tax – not filing tax returns or – and reporting income, I read weeks and – I get two weeks of testimony about stock transactions, and I read the prosecutor in the summation suggesting that these were fraudulent. Why is that stuff all there? Your Honor, I think it was closer to three or four weeks. Okay. So maybe it's three weeks. Maybe it's three weeks of this stuff. It doesn't help you. I understand. The point at the outset that no witness, as we point out, used the word fraud. This is not something that the witnesses ever characterized. There was a characterization by the government. Right. The reason that it was necessary for the government to put on evidence about the stock transactions and the reverse mergers was to show that it was the defendants' money in the first place. In other words, this is a specific items case where you're proving, or the government is proving, that, in fact, this property, this money, belonged to the defendants, was income to the defendants. There's no way to prove, there's no way that we could prove that these millions of dollars that went from – and millions of dollars in cash and stock that went from the United States to nominee accounts in Switzerland belonged to the defendants, or at least, I think, proved beyond a reasonable doubt, without showing where the money came from. So, in other words, this entire case was following the money. That's what the evidence is there for. Sotomayor, taking that point, why characterize the transactions as fraudulent? The prosecutor, in his closing argument, characterized the – rather briefly, characterized the actions as fraudulent, as he explained to the district court at the time, in order to make an argument about the defendants' motives. In other words – But is there any evidence that they're fraudulent? Yes, there is. Just to take an example, the fact that you had people, country club members, friends of friends, signing documents saying that they were the owners of stock or they were the presidents of public-traded companies, without actually being the presidents of public-traded companies or having any involvement in the stock transactions, is, at least in the generic sense that was discussed before the district court, fraudulent. I would say that the Court was very clear that the government couldn't argue and didn't argue that this was a violation of Section 10b, or Rule 10b-5, for example. The argument was, I think, actually, as the defendants put it in their briefing, that this was shady. That's really the defendants used that word, but I think that the fraud was used in a generic sense to point out that the defendants, in addition to having a tax motive for hiding their transactions and their Swiss nominee accounts from the government, also had an additional motive to hide their transactions from the government, which was because there was something – they were doing something wrong. Well, and that's my concern, and I don't know that it rises to the level of plain error, but it sure looks to me when you read this transcript, and I've read a lot of it, and I was wagging the dog here, there's weeks of testimony about these transactions and then days of testimony about what's actually charged in the case. Well, I agree with Your Honor that it doesn't rise to the level of plain error. I think that there's two different things to look at here, though, that should be kept separate. The first is the weeks of evidence about where the defendants' money, income, came from. That was entirely proper, and it was, in fact, necessary to show that the defendants had income that they controlled that went from their various securities transactions into these offshore nominee accounts. That was proving that the money was theirs in the first place. The issue of the prosecutor's use of the word fraud in closing argument, I think, is a distinct issue to the extent I don't think it's error, to the extent that it is error. It's certainly not plain, but that is very much a separate and discreet issue from the tail wagging the dog point about the defendants' money. Also not objected to, correct? I'm sorry? Not objected to? Also not objected to. Correct. So I would separate those two things. Could you turn back to the argument made by other counsel, and let me just – you've got two exhibits. They haven't been disclosed before to the defense. In Canada, the Court, it's actually three exhibits, Your Honor, three exhibits. Three exhibits, I'm sorry. I think my colleague just spoke. It's 52-52, isn't it? 44, 51, and 52, and 52 is not discussed. Okay. So the – but you've got these exhibits that they haven't seen before. They pop, and you introduce them for the first time on redirect. Why doesn't that – why isn't that new material? The – it's not new material within the meaning of this Court's Confrontation Clause cases, because the exhibits themselves within the four corners of the document, the existence of the document and the record, cannot be testimonial. And that's a point I wanted to sort of take a step back. I know we make this in our briefing, but the defendant's entire argument on this case – No, they're not – I understand your argument that they're not testimonial hearsay because they're business records. I've got a separate question, and maybe it's not a Confrontation Clause question, but they are introduced into evidence, and you haven't given him – you haven't given the other side a chance to see them before. And there's not – by the way, I take counsel's point. I know Judge Teelborg very well. When he says there's no recross, there's no recross. So they can't recross. So you've in effect put these documents in the record, testimonial hearsay or not, at first time in redirect, without disclosure to them before, and they've got no ability to challenge the records. If that's not a Confrontation Clause violation, isn't it some sort of evidentiary violation? With respect, Judge Hurwitz, I'd like to push it back against both of your premises, because I think – I think with respect, they're both wrong. The first – I'm often wrong, so tell me why. The idea that the defense had never seen these documents before is not correct. The defense, in their briefing and below, made much of the exhibits that Rush found and turned over to the government last minute. Those exhibits – I forget the numbers off the top of my head. They're in the 200 series. Those are not these exhibits. These are exhibits that were turned over to the defense in discovery well before the trial, along with all the other exhibits. So these are not – when the defendants talk about the new exhibits, I think it's 261 up through 270, but in any event, these are not newly discovered exhibits. So they identified before they were introduced as potential exhibits? I'm sorry, Your Honor? Were they identified – in other words, I know Judge Teelburg's practice is to make you identify all your exhibits. These were exhibited with all the other exhibits. These are the initial set of exhibits in the trial that were produced in the ordinary course in pre-trial discovery. So that's the first premise I want to push back against. The second is – and I hope I remember what my second point was correctly. I think that the other issue was – First one's pretty good. Well, I think that the other issue was whether it was unfair that sort of these documents just showed up in evidence. And I think that's where the Confrontation Clause issue really comes into play. As I was saying, the defense proceeds as though Crawford doesn't exist, but that's not the Confrontation Clause world we live in and hasn't been for more than 10 years. The documents themselves could have been entered in evidence outside the presence of the jury under Rule 104 as a preliminary question. There's no Confrontation Clause right to keep these documents out of evidence. The only part of this that implicates the Confrontation Clause is what Rush said about the documents. The documents themselves don't implicate the Confrontation Clause under Melendez-Diaz. I think that's pretty clear. Any foundational facts about the documents that you might have, say, in a Rule 104 outside the presence of a jury hearing don't implicate the Confrontation Clause. Those are just foundational facts to get documents into evidence. So the issue here is what Rush said in front of the jury about the documents. And that, as we demonstrate in our briefing, is almost exactly, in some cases using like verbatim the same phrases, as to what Rush testified to on direct examination and on cross-examination. So his testimony was not new. Correct. His testimony was not a new matter. And I think this Court must read the phrase new matter. What about the documents, though? What about the documents, Judge O'Scanlon? Well, the argument is that the documents themselves were new matter. The phrase new matter. Exhibits, what, 44, 51, and 52. Correct. The phrase new matter, as it's used in this Court's Confrontation Clause precedents, cannot, under Crawford, Lendis-Diaz, and that whole line of cases, be read to refer to nontestimonial exhibits. It's just, it's impossible, because the documents are not, don't contain testimonial statements. They don't contain statements that were made for the primary purpose under the objective facts of proving something in a criminal proceeding. Now, if the documents are not new matter, they're complaining about the inability to cross-examine, correct? Correct. They're not – there's a separate complaint about whether the exhibits themselves are hearsay, and I take your point on that, that they're not testimonial. But they're complaining about their inability to confront Mr. Rush about these exhibits, aren't they? They're complaining about – they're complaining about that and the documents themselves. And what I'm attempting to do is to separate out what could implicate the Confrontation Clause and what might not. But typically, they raised today the authenticity issue. They wanted to cross-examine on authenticity. Yes, Your Honor. And they did not raise that, as this Court pointed out, and I think my colleague conceded, that they did not raise that at trial. So that's not – I think that's – that the objection was outside the scope of cross. There was also Mr. Minns made a hearsay objection as to the statements from Gabrie, the Swiss banker, Swiss financial intermediary, within the documents. And that's at page 2531 to 2533 of the trial transcript. So – Supposing – supposing – if you've got more to say about that question, I hope you will say it, because I think he needs it. But I wanted to go to the next question. Supposing I don't buy what you're selling. Yes, Your Honor. The government didn't say anything about a harmless error. In its briefing or below? I mean, we didn't say anything below because it didn't come up. So – Well, and I read Brooks, and I read this recent 28J letter, what Brooks says about a harmless error. I'm having a tough time how I get this in on a harmless error, given that the government to some extent has waived it. I disagree with that characterization, Your Honor, because we, in our brief, explicitly address the prejudice prong of the plain error test, which is what we believe is applicable here. That the difference, of course, as the Court's aware, the difference is in a harmless error context, it's our burden to establish the error was harmless. In a plain error context, it's their burden to establish that the error was prejudicial. We argue in our briefing that the defendants cannot meet their burden of establishing prejudice under the plain error standard. But why is this a – why is this plain error review? There was an objection on confrontation clause grounds, I think by Mr. Kimmerer. I'm trying to figure out which of the two made the objection. Wasn't there an objection on confrontation clause grounds? No. Only on hearsay grounds? There was not an objection on confrontation clause. In the testimony of the revenue agent, Cheryl Bradley, towards the beginning of the trial, I think she was the third or fourth witness, there was an objection. Mr. Minns asked if he could have some follow-up questions. So to the extent that's an objection, that's an objection. We know there wasn't an authenticity or foundation objection. What were the precise objections raised by defendants to the new exhibits? With Cheryl Bradley, I mean, I'm just starting with Cheryl Bradley because I'm talking about Mr. Rush. With Mr. Rush, the defense objected, Mr. Minns objected to outside the scope of redirect and then objected to the hearsay statement within the document from Mr. Gavri. Okay. And then Mr. Kimmerer objected, I believe, to outside the scope, although I'm not as positive on that one. Again, that's – I know that that's – they're close together in the transcript. It's starting on 2531, and I was looking at it just at the table. I know that Mr. Minns objected on hearsay within the document and on outside the scope. The – at no point with the revenue agent or with any other witness in the trial or with Mr. Rush did either defendant ever make the argument they're making now, which is that to the extent this judge, this district judge has a procedural rule against recross, that rule must yield under the circumstances of this witness to the Constitution. And that's their argument. I'm not sure that's the argument they're making. I think the argument they're making is accepting that this judge had a rule against recross, that it violated the Confrontation Clause to introduce new material and redirect. If the judge had allowed recross, then there wouldn't be any problem at all. And so – but I thought, and I may be wrong, I've been wrong a couple times this morning now, that there was a Confrontation Clause objection raised below. Am I mistaken about that? I believe you're mistaken. I mean, it's certainly possible I'm wrong plenty of times as well, but I absolutely believe you're mistaken. And so if not, we do review for plain error. In that case, you should review – and that's our argument. You should review for plain error. And may I – I would be remiss if I didn't emphasize at least one argument that we also make under brief that could more simply dispose of all of this, which is that after Mr. Rush stepped down, after the end of the redirect, when neither of my colleagues made any request for recross, Mr. Mins specifically asked the district court to order Mr. Rush to remain under subpoena and available for recall. And that's – it's in the transcript, it – we cite it in our brief, and the court ordered that Mr. Rush remain available and stay in Phoenix and be subject to recall. So the – had Mr. Mins wanted to ask the questions that he puts in his brief, he could have called – in the defense case, he could have called Mr. Rush back to the stand because Mr. Rush was still available and subject to recall. And in a case cited in the defense brief, the Eleventh Circuit case, I realize that Judge Smith may care less about that, but I – to point out that it was in their brief, in the Ross case, the court actually found one of the reasons that a confrontation clause situation like this was harmless was because that if the witness was still available, the defense could have called the witness themselves to ask all these questions that they had wanted to ask and weren't able to on recross. I think I covered our competition clause again. I have four minutes remaining. I'm – there are a lot of issues in this case. I'm happy to address whatever the court would like to question me about, if there is anything. Roberts, I wanted to ask you a question about something your – the opposing counsel didn't have a chance to talk about. The – the returns that were filed in subsequent years, the FBARs that were filed in subsequent years, were introduced, I take it, to show guilty knowledge for failing to file earlier? That's correct, Your Honor. The FBARs were introduced. The phrase, the word that the trial attorney used at trial was to prove ownership. And that proves – Now, my question was, and it's – it was raised by the opening briefs in this case. Were these filed after a point when the government, through any of its agencies, had notified the defendants that they thought they had done something wrong by failing to file earlier ones? Yes. So the – the years at issue are 2007, 2008. Right. They filed in 2009 and 10. In 2009 and 10. The 2009 FBAR is due at the end of June of the following year, so June 2010. And the defendants were aware that they were under investigation as of April 2010. That was when Mr. Rush received this. If I know I'm under investigation for – the government's taking the position that I should have filed something in earlier years, and I file something in a later year, why does that show my guilty knowledge about the earlier year? And then – and I think I would – I would characterize it slightly differently. I understand that knowledge is sort of the touchdown of this whole case. But I knew that I had to file earlier. It's more – yeah, it's more – I don't think it was offered to prove exactly that, Your Honor. I think it was offered to prove the sort of the subjective part of ownership. In other words, it was offered to prove that the defendants were admitting that they owned this account, which I guess is more the actus reus element of a tax crime than the mens rea.  The government – well, the government was – at this point, it was a grand jury investigation. The government hadn't formally taken a position that was announced to them about anything. The government at this point is investigating the defendants. The defendants know that they're being investigated. They know that Rush has been subpoenaed for his documents. I believe Rush had already produced the documents. I don't know whether the crime fraud issue had been litigated at that point. I don't – or the waiver issue had been litigated. I don't think it had. So the defendants know they're under investigation. And knowing that, Mr. Kerr – Mr. Kerr, I'm sorry – Mr. Kerr then files these documents admitting that, in fact, these are his accounts. And that was what we offered them a trial to prove, was that it was an admission by the defendant that he owned this property. So under those circumstances, should he continue not to file? I mean, it's a sort of – it's a sort of catch-22. The government says, these are your accounts. You better file on them. He says, I do. Okay, I'll file. And then you say, ha-ha, you filed. Those must be your accounts. I'm not sure it proves anything. With respect – well, with respect, Your Honor, whether it proves anything or not, as long as the evidence was validly admitted, is a question of fact for the jury. I think – I'm not sure I would characterize it as catch-22, because this is the same issue that comes up in any tax case. I mean, every year, all of us are required to file our tax returns. And if we have offshore accounts, we're required to report our offshore accounts. So if you own it, then – or you have a financial interest in it, or you're a signatory of the account, then you have to file the F-bar. It arises automatically by operational law every year. The fact that someone is under criminal investigation doesn't give them a pass on the legal obligation that applies to every other citizen and permanent resident in this country, that they have to file tax returns and report their offshore bank accounts. And so, likewise, if they own the account, which they did, as the jury found, then they had to file an F-bar. And if they didn't, then they didn't. That obligation exists completely independent of the fact that they're under criminal investigation and that they committed crimes with respect to the earlier years, or at least as Mr. Kerr was convicted of committing the F-bar crimes with respect to the earlier years. Roberts, Thank you, counsel. Your time has expired. Gannon, Thank you, Your Honor. Roberts, Mr. Minns, you may proceed. Minns, Thank you, Your Honor. The F-bars were filed by Rush while he was still cooperating with the government a year and a half after he'd been fired. So the government created its own evidence to put into this trial to help convict the defendants. The cross, the hearsay evidence, I disagree with the government. It starts off, Exhibit 51 says, good news. What does that mean? Mr. Rush interpreted that Mr. Gabriel was telling everybody your money's been put where it should belong. Since they never got the money, another interpretation on cross would have been good news. We have stolen this money from Quill and Kerr. I guess without cross, we could guess that it's a religious connotation, too. It is testimonial, good news. It is test. Isn't it a business record? Pardon? Isn't it a business record? Absolutely. It wasn't created for the purpose of this trial. How could it be testimonial? Well, it's a statement, it's a hearsay statement of Pierre Gabriel, who was not before us. It is not a business record. I accept it's hearsay. I'm questioning whether it's testimonial. Yes, Your Honor. It is his testimony saying good news. We believe he was saying good news to Rush. Rush's testimony is it's saying good news to Quill and Kerr. The fact of the matter, it has all these codes, and if our clients understood those codes, that would be incriminating. If our clients had the access to that money and had received it, that would be incriminating. Our clients never received any of that money, and every penny they received in the United States was put on tax returns. On the 404B, Mr. Kimmer and Ms. Arnett both objected during the charge conference to the use of the word fraud, and there was an extensive debate about whether they could use the word fraud. The government conceded, as you brought out, Judge, that they had never used the word fraud during the case at all on any witness. Why should you use it now? And they said, well, we won't say securities fraud because we haven't proven securities fraud. We just want to say fraud. And for whatever reason, the judge says, granted, you can use the word fraud. So the objections were firmly made during the charge conference, so I submit that the 404B standard should be of use of discretion. I believe, can I yield 20 seconds to Mr. Kimmer? Yes, you may. Thank you. And my quick 20 seconds will be, in our pleadings, when we raised the issue concerning all of the stock things, we offered to stipulate to all of that evidence that our clients owned the stock, that they had the stock, that it was their stock, so we offered to stipulate to all of that, and if we had done that, this trial would have been probably a week. And I know they said that they had to do that to prove all these things. We offered to go ahead and agree to all of that, and I don't think it was necessary on these particular counts. Thank you, Your Honor. Thank you very much, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Smith, Hurwitz